**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SABBY VOLATILITY WARRANT MASTER FUND LTD., EMPERY ASSET MASTER, LTD, EMPERY TAX EFFICIENT, LP, EMPERY TAX EFFICIENT III, LP | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| KIROMIC BIOPHARMA, INC., MAURIZIO CHIRIVA-INTERNATI, TONY TONTAT, GIANLUCA ROTINO, PIETRO BERSANI, AMERICO CICCHETTI MICHAEL NAGEL, and JERRY SCHNEIDER | |
| Defendants. | |

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiffs Sabby Volatility Warrant Master Fund Ltd. ("Sabby"), Empery Asset Master, Ltd. ("Empery Master"), Empery Tax Efficient, LP ("Empery Tax"), and Empery Tax Efficient III, LP ("Empery Tax III," together with Empery Master and Empery Tax, the "Empery Entities"), collectively "Plaintiffs," by and through their counsel, respectfully allege, upon knowledge as to their own acts and upon information and belief as to the acts of others, as follows:

INTRODUCTION

1.     This is a securities action asserting claims under the Securities Act of 1933 (the "1933 Act") arising from a public offering of common stock by Kiromic BioPharma, Inc. ("Kiromic").  The public offering closed on July 2, 2021 (the "Offering") and was conducted

1

pursuant to a registration statement filed with the SEC on June 25, 2021 ("Registration Statement") and a final prospectus dated June 29, 2021 (the "Prospectus," with the Registration Statement, the "Offering Documents").

2.      Sabby purchased 500,000 shares priced at $5.00 per share through the Offering, for a total investment of $2.5 million. The Empery Entities purchased an aggregate of 1,000,000 shares priced at $5.00 per share through the Offering, for a total investment of $5 million. At the time of the Offering, Kiromic presented itself as a target discovery and gene-editing company which utilized artificial intelligence to create immunotherapy products. While Kiromic had no immunotherapy products on the market at the time, it had applications for two candidates pending with the Food and Drug Administration ("FDA"). The Offering Documents contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures otherwise required regarding the status of those applications.  In particular, Kiromic had received communications from the FDA on June 16 and 17, 2021 informing it that the FDA was placing clinical trial applications for its two candidate products on clinical hold. A clinical hold is an order issued by the FDA to delay or suspend clinical investigation of an applicant's products. When a proposed study is placed on clinical hold, no new subjects may be recruited for testing the drug, and patients already testing the drug must be taken off. A clinical hold can be imposed, among other grounds, where "(i) [h]uman subjects are or would be exposed to an unreasonable and significant risk of illness or injury; (ii) [t]he clinical investigators named in the IND are not qualified by reason of their scientific training and experience to conduct the investigation described in the IND; (iii) [t]he investigator brochure is misleading, erroneous, or materially incomplete. . . ."

3.      Kiromic did not disclose this information in the Offering Documents, and instead represented that clinical testing was expected to proceed in the third quarter of 2021.  Clinical testing did not proceed in the third quarter of 2021, nor was it likely given the FDA's imposition of a clinical hold.

4.      As a result of these false and misleading statements and omissions, and the resulting decline in the market value of Kiromic's stock, Plaintiffs have suffered significant losses and damages.

JURISDICTION AND VENUE

5.      The claims asserted in this Complaint arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l(a)(2), and 77o).

6.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1337 and Section 22 of the Securities Act (15 U.S.C. § 77v).

7.      Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v). The Offering was underwritten by ThinkEquity, a division of Fordham Financial Management, Inc. ("ThinkEquity) which maintains its offices at 17 State Street, New York, NY 10004. Plaintiffs purchased the shares underlying this action as part of the Offering through ThinkEquity. Therefore, this is the proper venue as the district where the offer or sale of the securities underlying this action took place, which Kiromic participated in as the issuer.

PARTIES

8.      Plaintiff Sabby Volatility Warrant Master Fund Ltd. is a company formed under the laws of the Cayman Islands.

9.      Plaintiff Empery Asset Master, Ltd. is a company organized under the laws of the Cayman Islands.

10.     Plaintiff Empery Tax Efficient, LP is a limited partnership organized under the laws of Delaware.

11.     Plaintiff Empery Tax Efficient III, LP is a limited partnership organized under the laws of Delaware.

12.     Defendant Kiromic BioPharma, Inc. is a Delaware corporation with its principal place of business in Houston, Texas.  Kiromic's shares trade on the Nasdaq Capital Market under the symbol "KRBP." Kiromic signed the Registration Statement through its Chief Executive Officer, Maurizio Chiriva-Internati.

13.     Defendant Maurizio Chiriva-Internati served, at times relevant to the claims alleged in this Complaint, as Kiromic's Chief Executive Officer and signed the Registration Statement either personally or by attorney-in-fact.

14.     Defendant Tony Tontat served, at times relevant to the claims alleged in this Complaint, as Kiromic's Chief Financial Officer and signed the Registration Statement either personally or by attorney-in-fact.

15.     Defendant Gianluca Rotino served, at times relevant to the claims alleged in this Complaint, as Kiromic's Chief Strategy and Innovation Officer and signed the Registration Statement either personally or by attorney-in-fact.

16.     Defendant Pietro Bersani served, at times relevant to the claims alleged in this Complaint, as one of Kiromic's Directors and signed the Registration Statement either personally or by attorney-in-fact.

17.     Defendant Americo Cicchetti served, at times relevant to the claims alleged in this Complaint, as one of Kiromic's Directors and signed the Registration Statement either personally or by attorney-in-fact.

18.     Defendant Michael Nagel served, at times relevant to the claims alleged in this Complaint, as one of Kiromic's Directors and signed the Registration Statement either personally or by attorney-in-fact.

19.     Defendant Jerry Schneider served, at times relevant to the claims alleged in this Complaint, as Kiromic's one of Kiromic's Directors and signed the Registration Statement either personally or by attorney-in-fact.

20.      Maurizio Chiriva-Internati, Tony Tontat, Gianluca Rotino, Pietro Bersani, Americo Cicchetti, Michael Nagel, and Jerry Schneider are collectively referred to in this Complaint as "Individual Defendants."

21.     Kiromic and the Individual Defendants are collectively referred to in this Complaint as "Defendants."

## FACTS GIVING RISE TO THIS ACTION

A.      Background

22.     Kiromic described itself to investors as a "target discovery and gene-editing company utilizing artificial intelligence and our proprietary neural network platform with a therapeutic focus on immuno-oncology." To generate revenue, Kiromic is dependent on the successful "development, regulatory approval and commercialization" of immunotherapy product candidates.  As of June 29, 2021, Kiromic had no approved products, had not generated any revenue, and continued to incur significant product and development expenses related to its ongoing operations.

B.      The ALEXIS Products

23.     As of June 29, 2021, Kiromic's only product candidates were a brand of immunotherapy products called ALEXIS-ISO-1 and ALEXIS-PRO-1 (collectively "ALEXIS"). As explained in the Offering Documents, the ALEXIS products are chimeric antigen receptor T

cell (CAR-T) therapies "designed to treat cancer by capitalizing on the immune system's ability to destroy cancer cells." Such therapies have "recently emerged as a revolutionary and potentially curative therapy for patients with hematologic cancers, including refractory cancers."

24. Before the ALEXIS products could be sold, Kiromic needed to obtain regulatory approval from the FDA. In the Offering Documents, Kiromic explained to investors that the process required by the FDA before a biological product could be marketed in the United States generally involved:

- completion of nonclinical laboratory tests and animal studies according to good laboratory practices, or GLPs, and applicable requirements for the humane use of laboratory animals or other applicable regulations;

- submission to the FDA of an IND, which must become effective before human clinical trials may begin;

- approval by an independent IRB or ethics committee at each clinical site before the trial is commenced;

- performance of adequate and well-controlled human clinical trials according to the FDA's GCPs, and any additional requirements for the protection of human research patients and their health information, to establish the safety and efficacy of the proposed biological product for its intended use;

- submission to the FDA of a BLA for marketing approval that includes substantial evidence of safety, purity, and potency from results of nonclinical testing and clinical trials;

- satisfactory completion of an FDA Advisory Committee review, if applicable;

- satisfactory completion of an FDA inspection of the manufacturing facility or facilities where the biological product is produced to assess compliance with cGMP, to assure that the facilities, methods and controls are adequate to preserve the biological product's identity, strength, quality and purity and, if applicable, the FDA's current good tissue practices, or GTPs, for the use of human cellular and tissue products;

- potential FDA audit of the nonclinical study and clinical trial sites that generated the data in support of the BLA; and

- FDA review and approval, or licensure, of the BLA.

25.     Thus, before human clinical trials could commence, an applicant had to complete nonclinical laboratory tests and animal studies and submit to the FDA an IND ("initial new drug") application, which occurred prior to the Offering. Kiromic explained that the IND "automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period."  In that event, the "IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin."  If the FDA imposes a clinical hold, "trials may not recommence without FDA authorization and then only under terms authorized by the FDA."

26.     On December 17, 2020, Kiromic submitted two IND applications with the FDA for the ALEXIS products. After communicating with the FDA, Kiromic resubmitted these applications on May 14 and May 17, 2021. The revised IND applications were for human clinical trials of the ALEXIS products.

    C.     The FDA Communications

27.     On June 16 and 17, 2021, Kiromic received communications from the FDA that the FDA was placing Kiromic's IND applications on clinical hold (the "FDA Communications"). The Offering Documents did not disclose this highly material information. The clinical hold had broad ranging implications for the IND applications, raising the possibility that they could be delayed for weeks or months with substantial costs required to address FDA issues, or that the clinical hold might never be lifted.

28.     The FDA Communications would undoubtedly have been material to investors, had they been disclosed, as is clearly demonstrated by the significant price drop that occurred immediately following the July 16, 2021 press release. Also, Kiromic's only prospect for continuing to advance the product candidates and for potentially generating revenue was from

7

sale of the ALEXIS products, which first required FDA approval. The FDA Communications

provided notice that Kiromic would not be able to commence with clinical trials as planned, and

might never do so.  Such a delay would have had a detrimental effect on business operations by

delaying access to much needed revenue and amplifying mounting costs.  As Kiromic itself

recognized in its Offering Documents:

> If we experience termination of, or delays in the completion of,
> any clinical trial of our product candidates, the commercial
> prospects for our product candidates will be harmed, and our
> ability to generate product revenue will be delayed. In addition,
> any delays in completing our clinical trials will increase our costs,
> slow down our product development and approval process and
> jeopardize our ability to commence product sales and generate
> revenue.

29.     The Offering Documents emphasized that "[t]he clinical and commercial success

of our current and any future product candidates will depend on a number of factors, including . .

. **timely completion** of our preclinical studies and **clinical trials**. . . ." (emphasis added).  Indeed,

Kiromic listed four "principal factors" that might affect its financial performance, two of which

were "slow or delayed IND applications," and "slow or delayed clinical trial enrollment."

30.     Moreover, information about the FDA Communications was also material to

investors by signaling the FDA's likelihood to ultimately grant approval for commercialization

of the ALEXIS products.  As Kiromic recognized in the Offering Documents, "[m]any of the

factors that cause, or lead to, a delay in the commencement or completion of clinical trials may

ultimately lead to the denial of regulatory approval of our product candidates."

31.     If the ALEXIS products were unable to obtain regulatory approval, Kiromic

recognized that they "may not be able to continue" operations.

32.     Kiromic did not commence clinical trials in the third quarter of 2021 as planned,

and to Plaintiffs' knowledge, Kiromic is subject to the FDA's hold notice to this day.

D.     The Offering

33.     On June 29, 2021, Kiromic announced the pricing terms of a public offering to be closed on July 2, 2021.  The offering resulted in the sale of 8,000,000 shares of Kiromic common stock at a price of $5.00 per share, for gross proceeds of $40 million. Kiromic announced the pricing of the Offering through a June 29, 2021 press release which listed the amount of shares offered, the price, directed the reader where to find the final prospectus, and explained that the shares of common stock "are being offered by" Kiromic.  The press release also explained that Kiromic planned to use net proceeds primarily for clinical trials of the ALEXIS products and certain other business uses, which would not be possible based on Kiromic's knowledge that its clinical trials were subject to a clinical hold.

34.     Plaintiffs understood that the primary purpose of the offering was to generate cash to fund upcoming human clinical trials for the ALEXIS products.

35.     The Offering was conducted pursuant to a registration statement filed with the SEC on June 25, 2021 ("Registration Statement") and a final prospectus dated June 29, 2021 (the "Prospectus," with the Registration Statement, the "Offering Documents").  The Offering Documents became effective on June 29, 2021.

36.     Sabby participated in the Offering and received an allocation of 500,000 shares priced at $5.00 per share, for a total investment of $2.5 million. Sabby's purchase was issued pursuant and traceable to the Offering because Sabby purchased its shares directly in the Offering.

37.     Empery Master participated in the Offering and received an allocation of 635,260 shares priced at $5.00 per share, for a total investment of $3,176,300. Empery Master's purchase was issued pursuant and traceable to the Offering because Empery Master purchased its shares directly in the Offering.

38.     Empery Tax participated in the Offering and received an allocation of 177,550 shares priced at $5.00 per share, for a total investment of $887,750. Empery Tax's purchase was issued pursuant and traceable to the Offering because Empery Tax purchased its shares directly in the Offering.

39.     Empery Tax III participated in the Offering and received an allocation of 187,190 shares priced at $5.00 per share, for a total investment of $935,950. Empery Tax III's purchase was issued pursuant and traceable to the Offering because Empery Tax III purchased its shares directly in the Offering.

E.     False and Misleading Statements in the Offering Documents[1]

40.     The Offering Documents contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

41.     In relevant part, the Offering Documents described the status of the ALEXIS products' applications to the FDA as follows:

> These products are in the pre-initial new drug ("IND") stages of the US Food and Drug Administration (the "FDA") clinical trial process. We are currently going through the IND enabling trials process and we expect that first in human dosing in Phase I of clinical trials will commence in the third quarter of 2021.

This statement was misleading because the Offering Documents made no mention of the FDA Communications informing Kiromic that their IND applications would be put on clinical hold. Notification of the imposition of a clinical hold is material information that a reasonable investor

---

[1] Unless otherwise stated, the false and misleading statements and omissions within the Offering Documents discussed in this Complaint are reflected in both the Registration Statement *and* the Prospectus.

would have expected to be included in a description of the status of the ALEXIS IND applications. However, this information was not made public until after the July 2, 2021 offering.

42.     Omission of the FDA Communications was especially misleading in light of the Offering Documents' ambitious statement that human dosing in Phase I of clinical trials was expected to commence in the third quarter of 2021.  With such an optimistic estimate, a reasonable investor would have been misled to believe that the FDA had not issued a clinical hold, or that Kiromic had no knowledge of the issuance of a clinical hold by the FDA.  This is especially true given that the ALEXIS IND applications were submitted on May 14 and May 17, 2021, so by June 29, 2021 the requisite 30 day period for the FDA to provide comments would have elapsed.

43.     Thus, failure to disclose the FDA Communications in the Offering Documents constitutes an omission of material information necessary to make the statements in the Offering Documents not false and misleading, when made.

44.     The failure to disclose the FDA Communications was also misleading in light of statements in the Offering Documents discussing the possibility of a clinical hold as something that "may" or "could" occur, not something that Kiromic had already been informed by the FDA had occurred:

- The IND automatically becomes effective 30 days after receipt by the FDA, unless the FDA raises concerns or questions regarding the proposed clinical trials and places the trial on a clinical hold within that 30-day time period. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. The FDA *may* also impose clinical holds on a biological product candidate at any time before or during clinical trials due to safety concerns or non-compliance. *If the FDA imposes a clinical hold*, trials may not recommence without FDA authorization and then only under terms authorized by the FDA. Accordingly, *we cannot be sure* that submission of an IND will result in the FDA allowing clinical trials to begin, or that, once begun, issues will not arise that suspend or terminate such trials.

- We *may* also experience delays in completing planned clinical trials for a variety of reasons, including delays related to: obtaining regulatory authorization to begin a trial, if applicable. . . .

- Further, a clinical trial *may* be suspended or terminated by . . . the FDA . . . due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or other regulatory authorities resulting in the imposition of a clinical hold. . . .

- The FDA's review of our data of our ongoing clinical trials *may*, depending on the data, also result in the delay, suspension or termination of one or more clinical trials, which would also delay or prevent the initiation of our other planned clinical trials.

- Later discovery of previously unknown problems with our product candidates, including adverse events of unanticipated severity or frequency, or with our third-party suppliers or manufacturing processes, or failure to comply with regulatory requirements, *may* result in . . . fines, warning letters or holds on clinical trials. . .

- Failure to comply with the applicable U.S. requirements at any time during the product development process, approval process or after approval, *may* subject an applicant to administrative or judicial sanctions. FDA sanctions *could include*, among other actions, . . . a clinical hold. . . .

(emphasis added)

45.     Discussion of a clinical hold as a mere possibility is false and misleading given that Defendants knew, or in the exercise of reasonable care should have known, that such a clinical hold had actually occurred.  While framed as cautionary language, the statements above only served to further mislead investors by communicating that management did not have reason to believe a clinical hold was going to be imposed. Disclosure of the FDA Communications were necessary to make these statements not false and misleading.

46.     The failure to disclose the FDA Communications was also misleading in light of the Offering Documents disclosure relating to Kiromic's contemplated use of proceeds.  The Offering Documents stated:

> We plan to use the net proceeds of this offering primarily for clinical trials for our ALEXIS-ISO-1 and ALEXIS-PRO-1 product candidates, GMP facility

12

expansion, intellectual property protection and reinforcement, IND applications and IND enabling trials and working capital and the remainder for general corporate purposes.

47.     Such statement was misleading because the FDA had already given notice that clinical trials of the ALEXIS products would be placed on clinical hold. As a result, the proceeds of the Offering could not be used for clinical trials, but instead would have to be used to address and resolve the clinical hold. Given that Kiromic remains subject to the clinical hold to this day, Plaintiffs believe the issues underlying the clinical hold are significant and therefore difficult, costly, or impossible to fix.

48.     Moreover, the Offering Documents omitted material information that was otherwise required to be disclosed.  Item 303(b)(2)(ii) of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), required Defendants to describe in the Offering Documents "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 CFR § 229.105, required the Offering Documents to describe "the material factors that make an investment in the registrant or offering speculative or risky." Defendants violated both Items 303 and 105 by failing to disclose the FDA Communications as a clinical hold undoubtedly constitutes an uncertainty that is reasonably likely to have a material unfavorable impact on revenues, or alternatively, a material factor which makes investment speculative or risky.

49.     In addition, the Offering Documents omitted to disclose that as of June 30, 2021, Kiromic had deficiencies in its disclosure controls and procedures regarding the identification of information for disclosure during the second and third quarters of 2021. While Kiromic did disclose that it had "identified material weaknesses in our internal control *over financial*

*reporting*" (emphasis added), it specifically tailored discussion of this risk factor to its financial reporting internal controls. In reality, the deficiencies in Kiromic's disclosure controls that existed at the time were far broader than its financial reporting and should have been represented as such. This represents material information that was otherwise required to be disclosed, as well as material information required to make its disclosure not misleading.

      F.   <u>The Truth Emerges</u>

    50.    At 2:53 PM (Eastern time) on July 16, 2021, two weeks after the closing of the July 2, 2021 Offering, Kiromic announced through a press release that it had received "comments" from the FDA regarding the ALEXIS products.  Kiromic's common stock began a significant price decline starting at 3:01 PM (Eastern time), just eight minutes after, and as a direct result of, the July 16 press release.  The stock price fell from $4.52 per share at 3:01 PM (Eastern time) on July 16 to $3.12 per shares at 4:00 PM (Eastern time), a drop of approximately 31% in less than an hour.  This demonstrates that Kiromic's failure to disclose the clinical hold was material.

    51.    On August 13, 2021, Kiromic issued a press release which made passing reference to "clinical hold issues" but did not otherwise expand on what those issues were.  The press release stated in relevant part, under the heading "Events occurring after June 30, 2021 until August 13, 2021:"

> Communications with the FDA - Supported by IQVIA, instead of simply addressing the FDA's questions with a written response only (WRO), we took the decision to apply for a Type A meeting with the FDA. The Type A meeting will address the clinical hold issues and will allow us to discuss path toward our first-in-human dosing.

    52.    Kiromic again referenced the clinical hold in passing in another press release on October 11, 2021:

> The Company is anticipating being granted a Type A meeting with
> the FDA by the first half of 2022 to discuss the clinical hold and
> the clinical development path forward of its previously submitted
> IND. Following the Type A meeting, the Company plans to
> resubmit the investigational new drug (IND) application, and will
> continue to coordinate closely with the FDA to meet all regulatory
> requirements.

53.     On February 2, 2022, Kiromic filed a Form 8-K with the SEC.  Kiromic's Form

8-K disclosed that on August 17 and 23, 2021, Tony Tontat, then Chief Financial Officer,

submitted reports through Kiromic's complaint hotline alleging "risks associated with the

Company's public disclosures in its securities filings and in statements made to the public,

investors, and potential investors regarding (i) the anticipated timing of the U.S. Food and Drug

Administration's ('FDA') authorization of its investigational new drug ('IND') applications and

(ii) the anticipated timing of human clinical trials."

54.     Kiromic formed a Special Committee to investigate these allegations.  The

Special Committee established that the "Company had received communications from the FDA

on June 16 and June 17, 2021 that the FDA was placing the Company's IND applications that the

Company submitted to the FDA on May 14 and May 17, 2021 for the ALEXIS-PRO-1 and

ALEXIS-ISO-1 product candidates, respectively, on clinical hold."  The Special Committee

further found that:

> The Company did not disclose the June 16 and 17, 2021 FDA
> Communications in (i) its Registration Statement on Form S-1
> (Registration No. 333-257427) that was filed on June 25, 2021 and
> declared effective on June 29, 2021, nor the final prospectus
> contained therein dated June 29, 2021 (collectively, the
> "Registration Statement"); . . .The Company consummated a
> public offering of $40 million of its common stock pursuant to the
> Registration Statement on July 2, 2021.

55.     Kiromic admits that it "may be subject to claims for rescission, . . . damages, . . .

or other securities law claims resulting from our failure to timely disclose" the FDA

Communications.  Indeed, Kiromic admits that their failure to disclosure the FDA

Communications could constitute misleading omissions:

> On July 2, 2021, we consummated a public offering of $40 million
> of our common stock. Neither the Registration Statement on Form
> S-1 with respect to this offering that was filed on June 25, 2021 nor
> the final prospectus dated June 29, 2021 with respect to this
> offering contained any disclosure with respect to the June 16 and
> 17, 2021 FDA Communications. . . .  Anyone who purchased
> shares of our common stock in the offering and anyone who
> purchased or sold shares of our common stock in the public market
> after June 16, 2021 could claim that they were misled by our
> failure to disclose the clinical hold on studies under the INDs for
> these product candidates and that they suffered damages.

56.     Moreover, Kiromic admits that "there were deficiencies in our disclosure controls

and procedures over the identification of information for disclosure during our second and third

quarters of 2021." In particular, Kiromic explains that "there was a deficiency in the disclosure

controls and procedures in place to ensure that information related to the June 16 and 17, 2021

FDA Communications was appropriately elevated and evaluated to allow timely decisions

regarding required disclosure."

57.     On September 29, 2021, Tony Tontat resigned from his position as CFO. It was

later revealed that Mr. Tontat submitted false information regarding his educational background

to Kiromic. Specifically, Mr. Tontat represented that he held a BA in Economics from Harvard

University, when he actually had received an ALB, a degree conferred by the Harvard Extension

School.

58.     On January 27, 2022, Kiromic terminated Maurizio Chiriva-Internati as Chief

Executive Officer for cause after finding evidence of "conduct that the Board believed was

inconsistent with the Company's policies."

59.     Kiromic's stock has dropped steadily lower since its precipitous drop immediately

following the July 16, 2021 press release. On March 7, 2022, Kiromic's stock closed at $

0.6785—86% lower than the Offering price of $ 5.00 per share. The further decline in Kiromic's

stock is attributable to the fact that it still has not resolved material issues relating to the clinical

hold. Further, had Kiromic not raised the $ 40 million with false representations, Kiromic's stock

would be worth significantly less or could even be worthless.

<u>INAPPLICABILITY OF STATUTORY SAFE HARBOR</u>

60.     Kiromic's "Safe Harbor" warnings in the Offering Documents were ineffective to

shield the statements and omissions complained of in this action from liability. These statements

and omissions were statements of current facts and conditions at the time the statements were

made. Further, to the extent that any of the alleged false or misleading statements can be

construed as forward-looking, the statements were not accompanied by any meaningful

cautionary language identifying important facts that could cause actual results to differ materially

from those in the statements.  Indeed, as described in paragraphs 44-45, many of the statements

framed as cautionary language were themselves misleading.

61.     Alternatively, to the extent that the statutory safe harbor otherwise would apply to

any of the allegedly false or misleading forward-looking statements, Kiromic is liable for these

statements because, at the time each of these statements was made, it knew the statement was

false or misleading and the statement was authorized or approved by an executive officer,

director, or other control person of Kiromic.

<u>COUNT I</u>

<u>Against Kiromic and the Individual Defendants
for Violations of Section 11 of the Securities Act</u>

62.     Plaintiffs repeat and reallege every allegation contained above.

63.     This Count is brought by Plaintiffs under Section 11 of the Securities Act, 15

U.S.C. § 77k.  For purposes of this Section 11 claim, Plaintiffs are not required to allege that any

Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 11 claim.

64.     The Offering Documents were materially false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as alleged above.

65.     Kiromic is the issuer for the Offering. As issuer of the shares, Kiromic is strictly liable to Plaintiffs for the misstatements and omissions in the Offering Documents.

66.     As signatories of the Offering Documents, directors of the issuer, or a person performing similar functions as to a director, the Individual Defendants were responsible for their contents and dissemination.

67.     None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true, did not omit any material facts, and were not misleading. In the exercise of reasonable care, the Defendants should have known of the false and misleading statements and omissions contained in or omitted from the Offering Documents.

68.     These Defendants issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented or failed to disclose, inter alia, the facts alleged above. By reasons of the conduct alleged, each of these Defendants violated Section 11 of the Securities Act.

69.     Plaintiffs' purchase of Kiromic common stock was issued pursuant to, and traceable to the Offering because Plaintiffs purchased their shares directly in the Offering.

70.     Plaintiffs have sustained damages. The value of Kiromic's common stock has declined substantially after and as a result of the alleged violations.

71.     At the times when it purchased Kiromic common stock, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before Kiromic's subsequent announcements. Less than one year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Complaint is based to the time when Plaintiffs filed this Complaint. Less than three years have elapsed from the time when the securities upon which this Count is brought were bona fide offered to the public to the time when Plaintiffs filed this Complaint.

<u>COUNT II</u>

<u>Against Kiromic for Violations of Section 12(a)(2) of the Securities Act</u>

72.     Plaintiffs repeat and reallege every allegation contained above.

73.     This Count is brought by Plaintiffs under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2). For purposes of this Section 12(a)(2) claim, Plaintiffs are not required to allege that any Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 12(a)(2) claim.

74.     By means of the defective Offering Documents—which include the Prospectus— Kiromic promoted and sold Kiromic stock to Plaintiffs for its own financial interests.

75.     The Offering Documents were required pursuant to a public offering and were materially false and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein, as alleged above.

76.     Kiromic successfully solicited the sale of its securities by participating in the preparation and distribution of the false and misleading Offering Documents, which included signing the Registration Statement.

77.     Kiromic owed to the purchasers of Kiromic common stock, including Plaintiffs, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that the statements were true and that the Offering Documents did not omit to state a material fact required to be stated in order to make the statements contained in the Offering Documents not misleading. Kiromic knew of, or in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Offering Documents.

78.     Plaintiffs' purchase of Kiromic common stock was issued pursuant to, and traceable to the Offering because Plaintiffs purchased their shares directly in the Offering.

79.     By reason of the conduct alleged in this Complaint, Kiromic violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs purchased Kiromic common stock pursuant to the Offering Documents and sustained substantial damages in connection with its purchases of the stock.  Accordingly, Plaintiffs have the right to rescind and recover the consideration paid for their Kiromic shares.

80.     At the times when they purchased Kiromic common stock, Plaintiffs were without knowledge of the facts concerning the wrongful conduct alleged in this Complaint and could not have reasonably discovered those facts before Kiromic's subsequent announcements. Less than three years have elapsed from the time when the securities upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year has elapsed from the time when Plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

<u>COUNT III</u>

<u>Against the Individual Defendants for Violations of Section 15 of the Securities Act</u>

81.     Plaintiffs repeat and reallege every allegation contained above.

82.     This Count is brought by Plaintiffs under Section 15 of the Securities Act, 15 U.S.C. § 77o.  For the purposes of this Section 15 claim, Plaintiffs are not required to allege that any Defendant acted with scienter or fraudulent intent, as those are not elements of a Section 15 claim.

83.     Each of the Individual Defendants was a control person of Kiromic by virtue of his or her position as a director or senior officer of the company, and by reason of his or her own involvement in the daily business of Kiromic. The Individual Defendants, at the time they held positions with Kiromic, were able to, and did, exercise substantial control over Kiromic's operations, including control of the materially false and misleading statements, omissions, and course of conduct complained of in this action.

84.     Indeed, Maurizio Chiriva Internati, Gianluca Rotino, and Tony Tontat were touted in the Offering Documents as "key executives," the loss of which would impede business operations.  Moreover, the Individual Defendants all signed the Registration Statement.

85.     Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on having signed the Offering Documents or having otherwise participated in the process that allowed the Offering to be completed.

86.     As a result of the foregoing, Plaintiffs have suffered damages.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

21

A.      Awarding damages to Plaintiffs for all harm sustained as a result of Defendants'

wrongdoing, in an amount to be proven at trial, including interest on the damages;

B.      Awarding Plaintiffs rescission on Count II to the extent they still hold Kiromic

securities, or if sold, awarding rescissionary damages in accordance with Section

12(a)(2) of the Securities Act;

C.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action,

including attorneys' fees and expert fees; and

D.      Awarding any equitable, injunctive, or other further relief that the Court may

deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.


Dated: New York, New York
        March 7, 2022

                                OLSHAN FROME WOLOSKY LLP


                                By:   /s/ *Thomas J. Fleming*
                                      Thomas J. Fleming
                                      Sahand Farahati (Pending Admission)
                                      *Attorneys for Plaintiffs*
                                      1325 Avenue of the Americas
                                      New York, New York 10019
                                      (212) 451-2300